FILED
2026 Sep-17 PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| FATHOM OLIVIA MOFFATT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 5:25-cv-01225-JHE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**[1]

Plaintiff Fathom Olivia Moffatt ("Moffatt") seeks review, pursuant to 42 U.S.C. § 405(g), § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her application for Supplemental Security Income ("SSI").[2] Moffatt timely pursued and exhausted her administrative remedies. This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **REVERSED**, and this action is **REMANDED** for further proceedings.

## I. Factual and Procedural History

Moffatt filed an application for SSI on November 16, 2020, alleging an initial onset date of November 1, 2020. (Tr. 12). The Commissioner initially denied her claim on June 6, 2022,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 16).

[2] Moffatt uses "anything but he" pronouns (tr. 31), and the medical records in this case use both she/her and they/them pronouns. The undersigned uses she/her pronouns to refer to Moffatt in this opinion, although some quotations may use other pronouns.

and again upon reconsideration on February 29, 2024. (*Id.*). Moffatt timely requested a hearing with an Administrative Law Judge ("ALJ"). (*Id.*). Following a hearing on August 20, 2024, the ALJ denied Moffatt's application in an unfavorable decision dated October 4, 2024. (Tr. 12–22, 31). Moffatt sought review by the Appeals Council, which denied her request for review on May 28, 2025. (Tr. 3). On that date, the ALJ's decision became the final decision of the Commissioner. On July 29, 2025, Moffatt initiated this action. (Doc. 1).

Moffatt was 25 years old on the date the ALJ rendered his decision. (Tr. 21). Moffatt has at least a high school education and some college. (Tr. 40–41). She does not have any past relevant work. (Tr. 21).

## II. Standard of Review[3]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

[3] In general, the legal standards applied are the same whether a claimant seeks SSI or Disability Insurance Benefits ("DIB"). However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

This court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan,* 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505 (a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520 (a)(4)(i-v). The Commissioner must determine in sequence:

(1) whether the claimant is engaged in substantial gainful activity

[4] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499.

(2) whether the claimant has a severe impairment;

(3) whether the claimant's impairment meets or equals an impairment listed by the Social Security Administration ("SSA");

(4) whether the claimant can perform his or her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

*Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1312 (11th Cir. 2021). If a claimant satisfies Steps One and Two, he or she is automatically found disabled if he or she suffers from a listed impairment. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). "Once a claimant proves that she can no longer perform her past relevant work, the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Id.* (cleaned up).

**IV. Findings of the Administrative Law Judge**

After consideration of the entire record and application of the five-step evaluation process, the ALJ made the following findings:

At Step One, the ALJ found that Moffatt had not engaged in substantial gainful activity since November 16, 2020, the application date. (Tr. 14). At Step Two, the ALJ found that Moffatt has the following severe impairments: dissociative identity disorder, post-traumatic stress disorder ("PTSD"), generalized anxiety disorder, and bipolar disorder. (*Id.*). At Step Three, the ALJ found that Moffatt does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15).

Before proceeding to Step Four, the ALJ determined Moffatt's residual functional capacity ("RFC"), which is the most a claimant can do despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined Moffatt has the RFC

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: can understand, remember, and carry out simple instructions; can concentrate and persist in two hour segments; interactions are limited to occasional interaction with coworkers and supervisors; no interaction with the public; adaptation is limited to occasional changes in the routine work setting; cannot perform work requiring specific production rate pace, such as assembly line work or work that has hourly production quotas.

(Tr. 16–17).

Because the ALJ determined that Moffatt had no past relevant work, he proceeded past Step Four to Step Five. (Tr. 21). At Step Five, the ALJ found that, considering Moffatt's age, education, work experience, and RFC, Moffatt is able to perform jobs that exist in significant numbers in the national economy. (*Id.*). Therefore, the ALJ determined that Moffatt had not been under a disability from November 16, 2020, through the date of decision and denied her claim. (Tr. 22).

**V. Analysis**

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Moffatt raises one overarching issue: that the ALJ failed to account for the limiting effects of her dissociative identity disorder in his RFC. (Doc. 14 at 15–23). She primarily argues that the ALJ failed to adequately assess the opinions of various medical providers: licensed psychologist Dr. Rebecca S. Blakeman, who conducted a consultative examination of Moffatt per the request of Disability Adjudication Services; licensed professional counselor Karen Demski, who is Moffatt's treating therapist; and licensed psychologist Dr. Suzan Volentine.[5] (*Id.* at 7, 20–21). Specifically, Moffatt states that the opinion evidence was consistent with other evidence that she dissociates and experiences multiple personalities ("alters"), not all of which have the capacity to perform job functions consistent with the RFC. Additionally, Moffatt argues that the ALJ failed to explain why he failed to include a limitation contained in a state agency opinion he found to be persuasive, instead including a different (but similar) limitation in the RFC. (*Id.* at 19–20).

The ALJ erred in assessing LPC Demski's opinion. Because the ALJ will necessarily have to reassess opinion evidence and Moffatt's own testimony on remand, the undersigned does not address any of the other claims regarding how the ALJ weighed opinion evidence or Moffatt's testimony.[6] That said, the ALJ also failed to explain why he deviated from the state agency opinion. Accordingly, to the extent that the ALJ believes that deviation is still warranted, he must also address that issue on remand.

---

[5] Moffat also argues that the ALJ improperly assessed the consistency of her statements, but that this alleged error is "inextricably intertwined" with "the ALJ's findings regarding the record generally and the opinion evidence . . . ." (Doc. 14 at 22).

[6] The ALJ discredited LPC Demski's opinion, credited the opinions of Drs. Blakeman and Volentine, and found that Moffatt's testimony was not entirely reflective of her limitations. Reassessing LPC Demski's opinion may affect how the ALJ views these other pieces of evidence.

### A. The ALJ Erroneously Found LPC Demski's Opinion to Be Unsupported by Objective Evidence

For claims filed on or after March 27, 2017, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the weight an ALJ affords to a medical opinion depends on several factors, including how well the opinion is supported by both subjective and objective medical evidence and whether the opinion is consistent with the record as a whole. 20 C.F.R. § 404.1520c(b) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . We may, but are not required to, explain how we considered the factors in [other] paragraphs.").

Where an ALJ otherwise articulates specific reasons, supported by substantial evidence, for crediting (or discrediting) a medical opinion, there is no reversible error. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) ("[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."); *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). Further, while the ALJ may not selectively cite to evidence that supports his decision while blatantly ignoring the contrary evidence, he is entitled to consciously weigh the evidence presented. *Battles v. Comm'r of Soc. Sec.*, 749 F. App'x 920, 922 (11th Cir. 2018) (per curiam) ("The ALJ need not 'specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection' insufficient for us 'to conclude that the ALJ considered her medical condition as a whole.'") (alteration in original) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)).

LPC Demski began seeing Moffatt around early April 2020 and continued to see her regularly through May 2024. (Tr. 430–62, 484–632). LPC Demski's initial clinical assessment revealed that Moffatt had a Global Assessment of Functioning ("GAF") result indicating a moderate impairment and inability to work. (Tr. 433). The record contains a great deal of material related to Moffatt's near-weekly interactions with LPC Demski, largely consisting of progress notes that briefly describe the problems or topics being addressed at each visit. (*See, e.g.*, tr. 430). These notes often mentioned Moffatt's dissociative disorder and self-reports of how it impacted her daily life. (*See, e.g.*, tr. 446–47). LPC Demski also provided her assessment of Moffatt during these appointments by checking next to pre-written descriptions printed on the progress note.[7] (*See, e.g.*, tr. 430).

In addition to the progress notes, LPC Demski administered various tests in April and May 2024. (Tr. 634–66). On April 8, 2024, LPC Demski administered a patient health questionnaire and general anxiety disorder survey (PHQ-9 and GAD-7). (Tr. 634). Based on Moffatt's answers to this questionnaire, LPC Demski noted "severe anxiety." (*Id.*). LPC Demski administered a mood disorder questionnaire on the same date, noting based on Moffatt's responses "screen for bipolar/spectrum." (Tr. 635). Also on April 8, 2024, LPC Demski administered the Beck Depression Inventory, scoring Moffatt at 38: a score that corresponds to severe depression. (Tr. 636–38). LPC Demski also conducted a Dissociative Experiences Scale – II (DES-II) examination on that date. (Tr. 639–45). Moffatt's score—60.36 out of 100—showed a "high likelihood of

[7] For example, the progress notes have a section labeled "Mood/Affect," next to which are spaces labeled "WNL," "Depressed," "Labile," "Angry/Agitated," "Anxious," "Lethargic," "Manic," "Flat," "Sad/tearful," and "Withdrawn." (Tr. 430). At the cited visit, LPC Demski checked the spaces next to "Depressed," "Anxious," and "Sad/tearful." (*Id.*).

dissociative d/o." (Tr. 645). On May 23, 2024, LPC Demski administered the Multidimensional Inventory of Dissociation 60-item version (MID-60). (Tr. 646–57). As they pertain to Moffatt's dissociations, this test resulted in scores within the clinical range for amnesia, awareness of alter personalities, angry intrusions, persecutory intrusions, depersonalization/derealization, distress about memory problems, loss of autobiographical memory, trance, and self-confusion; other scores were within clinical range for post-traumatic stress disorder and conversions disorder. (Tr. 646–47). The same date, LPC Demski administered the Vancouver Obsessional Compulsive Inventory (VOCI). (Tr. 658–66). LPC Demski did not include notes regarding the results of this testing, but Moffatt's score was at the 56.1 percentile compared to a group of respondents with OCD and at the 99.9 percentile compared to community adults. (Tr. 658–59).

Finally, LPC Demski provided her opinion on Moffatt's functional limitations and ability to work on June 14, 2024. (Tr. 667–76). On a form titled "Medical Assessment of Ability to Do Work-Related Activities (Mental)," LPC Demski indicated that Moffatt has poor to no ability to follow rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, or maintain attention and concentration. (Tr. 667). Under the objective findings section, LPC Demski listed Moffatt's diagnoses, her significant memory loss, and daily dissociation as evidence of functional limitation. (*Id.*). LPC Demski referenced specific findings in support of her opinion:

> Beck Depression Scale 38/63 – severe depression. Patient Health Q-9 21/27 – severe depression, GAP-7 (General Anxiety D/O 7) – 19/21 – severe anxiety. Mood D/O questionnaire – [positive] screening for bipolar, DES-II (Dissociative Experiences Scale II) 60.4 – high levels of dissociation associated [with] scores over 30. They scored in the 99.9th percentile of 'normal' adults, in 80.9th of others with DID.
>
> [ . . . ]

> They also scored significantly high on the MID-60 (Multidimensional Inventory of Dissociation – 60 items) [with] a 66. This score (over 64) indicates severe dissociative and post traumatic symptomology. The subscales were also in clinical range . . . . All of these represent significant functional limitations for maintaining a consistent daily work schedule in a safe manner for both Fathom and the general public. They have 'switched' alters and come to miles away from their home without any knowledge of how they got there or why ([a]nd the alter turned off phone tracking). This does not make them a safe employee as they are not predictable or safe even from themselves.

(Tr. 670). According to LPC Demski, this supports her conclusion that Moffatt is extremely limited in her inability to understand, remember or apply information, interact with others, concentrate, persist or maintain pace, or adapt and manage herself. (Tr. 672–73, 675).

The ALJ first addressed the progress notes provided by LPC Demski, finding that they "are not persuasive, nor supported by the medical record because there is no clinical data, objective tests or psychological evaluations upon which they were developed." (Tr. 20). The ALJ also found that the conclusions from these progress notes were inconsistent with the medical record which "shows [Moffatt] has the capability to understand, concentrate, interact and adapt." (*Id.*). In support of this conclusion, the ALJ cited portions of the opinion of Dr. Rebecca S. Blakeman, which the ALJ characterized as contradictory of LPC Demski's assessment of Moffatt's abilities.[8] (Tr. 480–81).

---

[8] Dr. Blakeman opined:

> Fathom presents as an individual claiming they are unable to work due to DID, losing time, and losing memory. Results of this evaluation are highly suggestive of autism and possible ADHD. Fathom may experience some anxiety if placed in a work setting, though this likely would subside with time on the job. Fathom does appear capable of acquiring and using new information and is expected to be able to understand and follow verbal directions. They are likely to experience anxiety when interacting with others or in high stress situations; this is likely to be associated with their feeling disconnected from the situation. They are also likely to be viewed by others as immature and dramatic. They are likely to have difficulty

After concluding that LPC Demski's progress notes were unpersuasive because of their inconsistency with the record, the ALJ assessed LPC Demski's June 14, 2024, opinion. (Tr. 20). The ALJ similarly found this opinion to be unsupported and inconsistent with the record. (*Id.*). The ALJ noted that:

> The medical records contain a checklist-style form that appears to have been completed as an accommodation to the claimant and includes only conclusions regarding functional limitations without any rationale for those conclusions and not based upon objective medical evidence, nor consistent with other substantial evidence of record or administered with objective testing methodologies. Thus, the undersigned finds this evidence has no probative value because it is not supported by any objective evidence. The opinion is not consistent with the medical evidence because the evidence shows claimant can understand and pay attention based upon her mental status evaluation results, interacts with others as evidenced by her robust social life with many friends and acquaintances, her ability to serve as a director of a large organization that puts on a convention for 35,000 to 40,000 attendees [and] her her [sic] operation of her own business selling products at multi-day fairs.

(Tr. 20–21). The ALJ again cited Dr. Blakeman's opinion, along with a Third-Party Function Report completed by Moffatt's mother, as evidence of inconsistency. (Tr. 21). The Third-Party Function Report indicated that Moffatt is able to dress herself, cook small meals regularly, do basic cleaning, and go out with her mother to run errands. (Tr. 265, 270). LPC Demski's report, which alleged that Moffatt could not maintain focus or concentration, nor interact with the public,

---

> coping with high stress work environments. Memory and concentration are expected to be adequate for at least simple job tasks; it is noteworthy that they indicated they were never able to learn computer tasks, though they were also told that they were the fastest at performing those tasks, such that they may not have an accurate estimate of their own abilities. Fathom may experience anxiety if faced with production norms, though per their report they may be able to perform very efficiently, even if they do not recognize that ability. If benefits are awarded, Fathom likely would benefit from assistance in managing their funds, due to their self-report that they overspend at times.

(Tr. 481).

contradicted those other reports. (Tr. 667). The ALJ also emphasized that Moffatt "makes the products she sells, which does demonstrate good concentration and attention skills." (Tr. 21).

Preliminarily, Moffatt argues that the ALJ's treatment of LPC Demski's opinion was erroneous because he rejected the checklist-style format, and there is no SSA rule dictating the form of opinion evidence. (Doc. 14 at 19–20). Moffatt is correct that the SSA has not promulgated rules that require medical opinions to take on a specific form. *See Schink*, 935 F.3d at 1261 (holding that a medical opinion may not be deemed unpersuasive *solely* due to its checklist-style format)[9]; *Hood v. Comm'r Soc. Sec.*, Case No. 5:22-cv-00586-SGC, 2023 WL 5917406, at *4 (N.D. Ala. Sep. 11, 2023) (holding that the ALJ's finding that a medical opinion was unpersuasive based on its checklist-style format, and not due to a lack of supportability or consistency, was erroneous). However, where an ALJ otherwise finds that checklist-style evidence is inconsistent with, or unsupported by the record as a whole, there is no reversible error. *Adams v. Comm'r of Soc. Sec.*, No. 23-11233, 2024 WL 2846726, at *3 (11th Cir. 2024) (per curiam) (following *Schink* and affirming the ALJ's decision to discount a checklist-style opinion where the ALJ articulated substantial evidence of the opinion's inconsistency with the record).

That said, the ALJ plainly erred here. Whatever conflicts exist between LPC Demski's opinion and Dr. Blakeman's opinion, the ALJ was simply incorrect to state that LPC Demski's opinion was not supported by objective testing methodology. As recounted above, LPC Demski administered a battery of tests predating her opinion, and she cited those tests in support of her

---

[9] While *Schink* was decided under an older regulatory scheme, the opinion still informs "what constitutes an adequate explanation of the supportability of a treating physician's medical opinions under the new regulatory scheme." *Hood v. Comm'r Soc. Sec.*, Case No. 5:22-cv-00586-SGC, 2023 WL 5917406, at *4 n.6 (N.D. Ala. Sep. 11, 2023).

opinion. Notably, these tests are similar to or the same as tests administered by other providers the ALJ found to be persuasive. For example, where LPC Demski administered the Beck Depression Inventory and the Dissociative Experiences Scale-II, Dr. Suzan Volentine administered the Beck Depression Inventory-II and two slightly different forms of the Dissociative Experiences Scale. (Tr. 424–26). In contrast to LPC Demski, the ALJ found Dr. Volentine's opinion to be "generally persuasive" based on the fact the her opinion was supported by "the medical record that contained results from the Beck Anxiety Inventory, Beck Depression Inventory-II, Clinical Interview Dissociative Experiences Scale tests . . . ." (Tr. 20). The ALJ offered no explanation for why the testing he explicitly found adequate to support Dr. Volentine's opinion would not also support LPC Demski's opinion. And Dr. Blakeman, whom the ALJ found to be "generally persuasive" (tr. 20), administered *no* independent testing during her psychological consultative examination. (*See* tr. 477–81). Notably, other than simply repeating the ALJ's statements, the Commissioner offers no plausible defense of the ALJ's actions here. (*See* doc. 15 at 12). Under the circumstances, the ALJ's decision to reject LPC Demski's opinion as having "no probative value" based on its lack of support was not based on substantial evidence.

Because the ALJ erroneously rejected LPC Demski's opinion, it follows that he will necessarily have to reassess the evidence on remand. This includes any inconsistencies between LPC Demski's opinion (when considered appropriately) and other opinions of record, as well as whether Moffatt's testimony is supported by opinion evidence.

### B. The RFC Failed to Adequately Account for Limitations Proposed by Dr. Atkins

Moffatt also argues that the ALJ erred by, without explanation, failing to account for a recommendation by state reviewer Howard G. Atkins, Ph.D, that Moffatt be limited to a gradual introduction of changes in work setting. (Doc. 14 at 19; doc. 18 at 3).

An ALJ is obligated to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996). As to medical opinions, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P. If the ALJ fails to clearly explain and address those conflicts, it is reversible error. *Weidlich v. Comm'r of Soc. Sec.*, No. 22–13309, 2023 WL 8015753, at *2 (11th Cir. Nov. 20, 2023) (citing SSR 96-8p; *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)).

Dr. Atkins reviewed Moffatt's claim at the initial level. (Tr. 86–103). As part of this review, Dr. Atkins considered the opinions of Dr. Blakeman, Dr. Volentine, and LPC Demski (among others). Dr. Atkins recommended the following limitations for Moffatt:

> The totality of the evidence suggests that the [claimant] is not precluded from all work-related activities. Available data suggests the [claimant] is able to carry out simple instructions, follow simple work-like procedures and make simple work-related decisions, respond appropriately to supervision, coworkers and work situations and *deal with changes in a routine work setting if introduced gradually*.

(Tr. 100) (emphasis added). The ALJ found that Dr. Atkins' opinion was "generally persuasive" and largely consistent with the record, adopting several of its conclusions. (Tr. 19). However, the RFC rephrased this to some extent, not including a "gradual" introduction of changes but including limiting Moffatt to "occasional changes in routine work setting." (Tr. 17).

Moffatt argues that this deviation is erroneous because it imposes a quantitative limitation (i.e., occasional changes) on Moffatt rather than a qualitative one (i.e., gradual changes). (Tr. 18 at 3). The Commissioner responds that the RFC's occasional changes limitation is "very similar" to the gradual changes language used by Dr. Atkins. (Doc. 17 at 10). While the Commissioner is correct that there are similarities between "occasional" and "gradual," they are not identical. And they are not similar enough that the undersigned can assume that the ALJ meant for the one to substitute for the other, either. Practically, this is obvious: occasional, abrupt changes would be consistent with the limitations in the RFC but inconsistent with the limitations in the state consultant's opinion. Similarly, frequent changes would be consistent with Dr. Atkins' opinion as long as those changes were gradually introduced. In other words, there is a genuine tension between the two terms, unexplained by the ALJ.

Other district courts have come to similar conclusions. For instance, in *Watson v. Kijakazi*, the Western District of Wisconsin found that the term "occasional" referred to the quantity of interactions required while the term "superficial" was based on the quality or depth of those interactions. No. 21-cv-120-wmc, 2022 WL 325586, at *4 (W.D. Wis. Feb. 3, 2022). And in *Miller v. Kijakazi*, the Eastern District of Oklahoma reversed an ALJ's decision to include an occasional contact limitation rather than a superficial contact limitation. No. CIV-20–218-SPS, 2021 WL 4311811, at *4 (E.D. Okla. Sep. 22, 2021). The situation here is similar; the RFC accounts for the frequency of changes to Moffatt's work duties but not for how the method of how those changes would be introduced.

This is not to say that the ALJ was obligated to *accept* Dr. Atkins RFC. Indeed, the ALJ rejected the opinion in part, stating that the consultant's diagnosis of autism as "neither supported or consistent with the medical record." (Tr. 19). It is possible that the ALJ opted for "occasional"

changes rather than "gradual" ones based on this partial rejection. But the Commissioner points to nothing in the record that would support that conclusion (*see generally* doc. 15 at 9–10), and the court cannot simply speculate as to whether that is the case.

While the ALJ may have had a good reason for reformulating Dr. Atkins' proposed limitations, it is not one that cannot be gleaned from the record. Accordingly, to the extent that the ALJ chooses to include this reformulation in the RFC,[10] he should explain the rationale for adopting the "occasional changes" limitation as opposed to the "gradual changes" limitation.

**VI. Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Moffatt's claim for SSI is **REVERSED**, and this action is **REMANDED** for further proceedings. A separate order will be entered.

DONE this 17th day of September, 2026.

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

[10] It is certainly possible that the ALJ's decision to adopt this specific limitation may be altered by his reassessment of the opinion and testimonial evidence.